**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**D.N., by Sheila Newbon, her next friend, parent and natural guardian,**

          **Plaintiff,**

**-vs-**                                        **Case No. 6:07-cv-1494-Orl-28KRS**

**THE SCHOOL BOARD OF SEMINOLE COUNTY, FLORIDA, and KATHLEEN MARY GARRETT,**

          **Defendants.**

_____

# ORDER

The sad allegations of this case—and the multitude of companion cases also filed in this Court—are that Defendant Kathleen Garrett ("Garrett") engaged in a pattern of abusive conduct directed at a group of particularly vulnerable students entrusted to her charge as a teacher of autistic students at South Seminole Middle School ("South Seminole"). Some of Garrett's conduct gave rise to criminal charges in state court, resulting in a conviction on one count of child abuse. In this case, Plaintiff has filed a three-count Amended Complaint (Doc. 34) against Garrett and the School Board of Seminole County ("School Board"). Against Garrett, Plaintiff asserts a violation of 42 U.S.C. § 1983 (Count II); against the School Board, Plaintiff alleges a violation of § 1983 (Count I) as well as a state-law claim for Negligent Hiring, Supervision, and Retention (Count III). Before the Court are the motions for summary judgment filed by Garrett (Doc. 66) and the School Board (Doc. 61).

I. Background

D.N. was born on February 11, 1989. (Doc. 94 at 5). According to D.N.'s mother, Sheila Newbon, D.N. was diagnosed as autistic at the age of four and suffers from profound mental retardation. (Newbon Dep. April 30, 2008, at 9-10). D.N. is mostly nonverbal, with limited language skills (Doc. 94 at 5), and she is unable to consistently communicate her needs, (Newbon Dep. at 12). Due to her disabilities, D.N. enrolled as a special education student at South Seminole during the 2003-2004 and 2004-2005 school years.[1] South Seminole established a "co-teaching" concept for the 2003-2004 school year whereby the students would divide their time between the two teachers for autistic students, Garrett and Lisa Callovi ("Callovi"). Under this teaching concept, Garrett emphasized vocational and life skills while Callovi focused on academics. It is alleged that during D.N.'s time in Garrett's classroom, Garrett subjected D.N. to various forms of physical, emotional, and verbal abuse and that D.N. witnessed similar acts of physical, emotional, and verbal abuse directed at her fellow classmates.[2] (Am. Compl. ¶¶ 32-33). After allegations of abuse were reported in

---

[1]Though in her deposition and Amended Complaint Newbon alleges that D.N. was in Garrett's classroom only for the 2003-2004 school year, (Am. Compl. ¶ 31; Newbon Dep. at 57-59, 64), it appears from the record that D.N. was enrolled in Garrett's classroom for the 2004-2005 school year as well. Sabrina Mort, one of Garrett's teacher's aides who provides extensive deposition testimony as to Garrett's conduct regarding D.N., was not present during the 2003-2004 school year and could not provide the testimony she does without D.N. having been enrolled at South Seminole during the 2004-2005 school year. Additionally, Jennifer Rodriguez, a teacher's aide in Garrett's classroom during both the 2003-2004 and 2004-2005 school years, testified that D.N. was present in Garrett's class both years. (Rodriguez Dep. May 28, 2008, at 97).

[2]The Amended Complaint alleges that D.N. witnessed the severe conduct that Garrett directed towards her fellow classmates, much of which has been documented elsewhere. See J.V. ex rel. L.O. v. Seminole County Sch. Bd., No. 6:04-cv-1889, Doc. 164 (M.D. Fla.

October 2004, Garrett was removed from the classroom and later resigned from her employment with the School Board. (Doc. 94 at 6).

Though Newbon has no direct knowledge as to any of the alleged incidents of abuse, (Doc. 94 at 6), she relies upon the deposition testimony of Jennifer Rodriguez ("Rodriguez") and Sabrina Mort ("Mort")—teacher's aides who worked in Garrett's classroom at the time—as support for her allegations. Regarding allegations of verbal abuse in the Amended Complaint (Am. Compl. ¶ 33(c)), Rodriguez and Mort confirm Garrett's use of profanity and derogatory comments made to, and in the presence of, D.N. Rodriguez described Garrett as routinely directing profane statements at D.N., calling her a "fucking little bitch" and a "stupid bitch." (Rodriguez Dep. May 28, 2008, at 45). According to Mort, Garrett would tell D.N. to "sit the fuck down" and call her "scummy," a "dirt bag," a "bitch," an "ass," a "fucking little cunt," and, on one occasion, a "nasty little nigger." (Mort Dep. May 28, 2008, at 40-41).

The Amended Complaint also alleges that Garrett "would routinely elbow D.N. in the mouth." (Am. Compl. ¶ 33(c)). Rodriguez reported that in response to some conduct of D.N.'s—described as attempting to scratch Garrett, put her mouth on Garrett, or not doing

---

filed Mar. 21, 2007).
      Additionally, the Amended Complaint alleges that Garrett "would physically strike and hit D.N. in the bathroom routinely." (Am. Compl. ¶ 33(a)). Plaintiff, however, has provided the Court with no evidence that Garrett ever struck D.N. in the bathroom, much less as a matter of routine. Plaintiff also alleges that Garrett would place D.N. in the bathroom with the door closed and locked. (Id. ¶ 33(b)). The record reflects that Garrett used the bathroom as a "cool down room"—a place where students were sent so that they would not further disturb the other students in the classroom. This Court, however, has previously held that, though not optimal, the use of a bathroom as a cool down location for timeouts is not unconstitutional, see J.A. ex rel. Abelove v. Seminole County Sch. Bd., No. 6:05-cv-975 (M.D. Fla. Apr. 19, 2007) (Doc. 134, order granting motion for summary judgment), and will not readdress this holding at this point.

her work—Garrett struck D.N. in the face with her elbow approximately five times. (Rodriguez Dep. May 28, 2008, at 20-21, 24). Rodriguez described the force of the elbowing as "hard enough that it can make you move. . . . [O]ne time it left a mark from another [student's mouth] on her sleeve, so there was contact."³ (Id. at 115). However, D.N. required no medical attention because of this behavior. Mort states that she saw Garrett raise her elbow and fist at D.N. and "[t]ell her to sit back down or she would knock her out" in order to intimidate D.N., but Mort does not remember Garrett ever making contact. (Mort Dep. May 28, 2008, at 19, 22-23, 25).

Rodriguez and Mort describe numerous incidences where Garrett would restrain D.N. On two occasions, Garrett restrained D.N. by bending her thumb back, but Rodriguez could not testify as to whether the restraint caused pain to D.N. (Rodriguez Dep. May 28, 2008, at 56-58, 60-61). Mort witnessed one of these thumb restraints and stated that Garrett "grabbed D.N.'s thumb because D.N. went to claw at her." (Mort Dep. May 28, 2008, at 65). Garrett would also restrain D.N. by placing her arms behind her back, often because D.N. was attempting to remove her clothing in class. (Rodriguez Dep. May 28, 2008, at 68, 75).

---

³Rodriguez's description of the force used by Garrett when elbowing D.N. does not rise to the level of that presented in M.S. ex rel. Soltys v. Seminole County School Board, No.6:07-cv-1481 (M.D. Fla. July 10, 2009) (Doc. 115, order denying motion for summary judgment) where the Court found—though not relying on the elbowing alone—that a jury could find that Garrett's conduct was conscience-shocking. In M.S., Garrett reportedly struck the plaintiff with sufficient force to cause the plaintiff's "whole head to jerk." Id. at 4-5. However, when questioned whether she ever witnessed Garrett elbow D.N., Sabina Nowik—a former teacher's aide for Garrett who was working in Callovi's classroom at the time of D.N.'s enrollment at South Seminole—responded, "She might have. I don't recall. I mean, she – Anybody that would come over to her she would – I mean, it wasn't, you know, an abusive elbow, it was just more of a get away from me nudge." (Nowik Dep. May 27, 2008, at 71). Nowik later described these elbowing more as "an annoyance." (Id. at 91).

Approximately five times, Garrett attempted to prevent D.N. from disrobing by tying D.N.'s shirt to her chair. (Id. at 75-76). Garrett would pull the shirttail through the hole in the back of the chair and tie a knot in it so as to prevent D.N. from being able to remove the shirt. (Id.). Mort described Garrett as tying a sweatshirt around D.N.'s waist and arms while D.N. was misbehaving and stating, "I'll strap you in here and you won't get out." (Mort Dep. May 28, 2008, at 54, 114). Mort states that on one occasion when D.N. wore a shirt with a hole in the front, revealing her bra, Garrett made D.N. cry by refusing to allow D.N. to turn her shirt around in order to place the hole in the back and telling her, "[Y]ou're not gonna turn it around, you've got a hole in your shirt, you're gonna wear it." (Mort Dep. July 25, 2007, at 132).

Newbon claims that as a result of D.N.'s exposure to Garrett and the events in her classroom, D.N. increased the frequency of her aggressive behaviors and tantrums. (Newbon Dep. at 43-44). She alleges that this increased aggressive behavior consists of pinching, hitting, and attempts to headbutt people placing demands on her, such as teachers. (Id. at 46). Newbon also reports that D.N. began repeating "you hit me" and "you pinched me" but states that she does not know whether D.N. heard these statements in Garrett's classroom.[4] (Id. at 36).

Newbon admits that no one has told her that any increase in D.N.'s aggressive behaviors is linked to D.N.'s experience in Garrett's classroom or that D.N. has suffered any

---

[4]Though Newbon states in her deposition that D.N. would repeat "you hit me" and "you pinched me," Newbon reported to D.N.'s retained psychologists that D.N. actually repeated "don't hit" and "don't punch." (Deborah Day Report, Ex. 1 to Doc. 76).

-5-

long-term or permanent emotional and psychological trauma. (Id. at 24, 42, & 47). However, D.N.'s retained psychological experts connect D.N.'s behavior to Garrett's classroom. Without conducting an independent examination of D.N. and admitting that upon conducting his own examination his opinion may change, Dr. Bennett Leventhal, M.D., opines that "D.N. may very well have a persistent re-awakening of the fear of pain and discomfort in the school setting," that "the school, which should be a safe haven, has become a place of fear and dread," and that D.N.'s "fears and anxieties will continue for a long time." (Leventhal Report, Ex. 4 to Doc. 71, at 5). Dr. Deborah Day, a psychologist, states that D.N. "learned aggression" and that her "aggression increased following the observation . . . and experience of [the] acts perpetrated by Ms. Garrett." (Deborah Day Report, Ex. 1 to Doc. 76, at 5).

Despite opinions of Newbon and her retained psychologists that D.N. learned aggressive behaviors from her time in Garrett's classroom, the record reflects the contrary. D.N. has an extensive history of aggressive behavior towards others, including both her classmates and authority figures, beginning as early as preschool. In preschool, D.N. would scratch other children to make them stop crying or scratch the teacher to communicate her displeasure or desire to discontinue a particular activity. (See Pre-Referral Information and/or Behavioral Information, Ex. B to Doc. 66). A 1998 Behavioral Summary described D.N. as having weekly tantrums where she would cry and scratch others. (May 6, 1998 Behavioral Summary, Ex. E to Doc. 66). In 1999, Eastbrook Elementary noted D.N.'s physical aggression towards others, including hitting, scratching, and yelling. (Feb. 23, 1999 Behavioral Program, Ex. C to Doc. 66). Once beginning middle school, D.N.'s behavioral

-6-

problems escalated, with D.N. displaying tantrums and aggressive behavior at least three times per week. (March 7, 2002 Sanchez Report, Ex. F to Doc. 66). This behavior included D.N. crying, kicking, and scratching others. (Id.). An October 31, 2002 Behavioral Plan describes D.N. as displaying aggressive behaviors, including pinching, scratching, and headbutting her peers and adults. (Oct. 31, 2002 Behavioral Plan, Ex. G to Doc. 66).

During her time in Garrett's class, D.N. continued to display a number of aggressive tendencies. Rodriguez stated that D.N. would have a bad day and "just start going at you" for various reasons, including lack of sleep, deprivation of a food for dietary needs, and because she was "P-M-S-ing." (Rodriguez Dep. May 28, 2008, at 78). Mort reported that D.N. would grab at clothing and hair, kick, spit, and pinch. (Mort Dep. May 28, 2008, at 24). Nowik reported that D.N. would scratch her "all the time" and that D.N. "was too busy harming everybody else" to hurt herself. (Nowik Dep. at 82-83). Nowik states that as a result of one of D.N.'s attacks, she has scars that will last the rest of her life. (Id. at 59-60).

## II. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving

party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III. Garrett's Motion for Summary Judgment

In her motion for summary judgment, Garrett argues that D.N. suffered no constitutional deprivation and that even if D.N. did suffer such a deprivation, Garrett is entitled to qualified immunity.[5] Government officials engaged in discretionary duties have

---

[5]Garrett also argues in her motion for summary judgment that Plaintiff's § 1983 claims are barred by a four-year statute of limitations. Garrett argues that because D.N. filed her complaint on September 19, 2007, all incidents which occurred prior to September 19, 2003 are barred. (Doc. 66 at 24). However, "[a] cause of action under [§ 1983] will not accrue, and thereby set the limitations clock running, until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted

the benefit of qualified immunity when sued in their individual capacities so long as their conduct does not violate any clearly established statutory or constitutional rights known to a reasonable person. Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002). Qualified immunity is not just a defense to liability, but it is also a defense from suit and so must be determined at the earliest possible stage of litigation. Id. (citing GJR Invs., Inc. v. County of Escambia, 132 F. 3d 1359, 1370 (11th Cir. 1998)).

A public official must first establish that she is entitled to the benefit of qualified immunity by proving that "'[s]he was acting within the scope of h[er] discretionary authority when the allegedly wrongful acts occurred.'" Id. (quoting Courson v. McMillian, 939 F.2d 1479, 1484 (11th Cir. 1991)). Once the defendant meets that burden, the plaintiff must then "show that qualified immunity is not appropriate" under the two-part test articulated in Saucier v. Katz, 533 U.S. 194, 201-02 (2001). The first question under that test is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional violation is revealed after considering the facts most favorably to the plaintiff, the defendant is entitled to summary judgment. See Baltimore v. City of Albany, 183 F. App'x 891, 896 (11th Cir. 2006);

---

the injury." Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003). Under the facts of this case, the question of when D.N.'s mother knew or should have known of any abusive conduct inflicted upon D.N. is a question of fact for a jury to decide, especially in light of the nature of the alleged injuries.

The Court has previously addressed acts of verbal abuse similar to those alleged by Plaintiff. See T.W. ex rel. Wilson v. Seminole County Sch. Bd., No.6:07-cv-155 (M.D. Fla. April 28, 2009) (Doc. 158, order granting motion for summary judgment). The Court reiterates that it does not condone the use of such inappropriate and offensive language in a classroom setting, but the use of foul and belittling language does not constitute a violation of D.N.'s constitutional rights sufficient to maintain a § 1983 claim.

see also Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280-81 (11th Cir. 2004). If the facts reveal a constitutional violation, the Court must then proceed to the second step of the Saucier inquiry and ask whether, at the time of the violation, the official "would have realized the acts violated already clearly established federal law.'" Baltimore, 183 F. App'x at 896 (quoting Garrett, 378 F.3d at 1278-79); see also Kirkland ex rel. Jones v. Greene County Bd. of Educ., 347 F.3d 903, 905 (11th Cir. 2003); cf. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250-53 (2d Cir. 2001) (construing the absence of case law in that circuit recognizing the substantive due process right in the public school setting as "a strong indication that the right to be free from excessive force is so well-recognized and widely observed by educators in public schools as to have eluded the necessity of judicial pronouncement"). As explained below, Plaintiff has not presented evidence that could support a jury finding that Garrett's actions towards D.N. violated her substantive due process rights.[6]

The Fourteenth Amendment's substantive due process right protects persons from the arbitrary exercise of governmental power and prevents governmental power from being used for the purpose of oppression. A.B. ex rel. Baez v. Seminole County Sch. Bd., No. 6:05-cv-802, 2005 WL 2105961, at *5 (M.D. Fla. Aug. 31, 2005). Embodied in this right is the right to be free from excessive force at the hands of a government official. Dockery v.

---

[6]Because the Court finds no violation of D.N.'s constitutional rights, the Court need not reach the issue of whether any such right was clearly established. However, this Court has previously determined in the companion cases that once a constitutional violation has been established on the part of Garrett, she is not entitled to the defense of qualified immunity. See M.S. ex rel. Soltys v. Seminole County School Bd., No.6:07-cv-1481 (M.D. Fla. July 10, 2009) (Doc. 114, order denying motion for summary judgment).

Barnett, 167 F. Supp. 2d 597, 602 (S.D.N.Y. 2001). To determine if a constitutional deprivation has occurred that would subject a government actor to § 1983 liability, the "'court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Thomas v. Bd. of Educ. of W. Greene Sch. Dist., No. 2:04-cv-1661, slip op., 2006 WL 3538960, at *2-3 (W.D. Pa. Dec. 7, 2006) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The leading case of Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980), adapted the general standard to the context of corporal punishment in a school setting, concluding that "the substantive due process inquiry . . . must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Id. at 613; see also Neal ex rel. Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074-76 (11th Cir. 2000).

These factors apply to the facts of this case with some difficulty given that the victim is unable to communicate and has significant preexisting mental and emotional disabilities requiring special care. Because of this, D.N.'s developmental disabilities must be considered in determining the need for force, the extent of injury, and the maliciousness of Garrett's actions. See Dockery, 167 F. Supp. 2d at 604 ("[T]he issue is better reserved for a jury—especially considering that . . . plaintiffs in this case are autistic children, who are more vulnerable and less capable of communicating than other children."); Roe ex rel. Preschooler

-11-

II v. Nevada, 332 F. Supp. 2d 1331 (D. Nev. 2004) (denying motion to dismiss § 1983 claims against teacher who allegedly slapped an autistic, non-verbal child or made him slap himself, slammed the child into a chair, and made him walk from the bus to the classroom without shoes); see also Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1240 (10th Cir. 1999) (considering victim's severe disabilities in determining a principal's § 1983 liability for failure to implement policies to protect students from each other); cf. Fessler v. Giles County Bd. of Educ., No. 1-00-0120, 2005 WL 1868793 (M.D. Tenn. July 27, 2005). The conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless.

### a. Need for the Application of Force

Though reasonable people may disagree as to when—if ever—corporal punishment is necessary in a school setting, the record evidence establishes that the incidents of alleged misconduct by Garrett were arguably in response to D.N.'s own misbehavior and thus arguably either for disciplinary or safety purposes. The record reflects that Garrett used some level of force against D.N. on several occasions and for various reasons. These reasons ranged from a need to stop D.N. from removing her clothing in class to preventing D.N. from clawing at Garrett during an outburst. D.N.'s history of violent and dangerous misconduct—particularly illustrated by a former teacher's aide's testimony that D.N. scarred her for life during a violent outburst—cannot be ignored when examining Garrett's need for the application of force. Though not optimal, this Court cannot say that no reason existed for Garrett's use of force or that the amount of force applied was so disproportionate to the

need presented that it shocks the Court's conscience.[7]

### b. Extent of Injury Inflicted

While recognizing that three factors control the analysis, Garrett bases the majority of her argument for summary judgment on the basis of minimal, if any, physical injury to D.N. Plaintiff has presented no evidence establishing that Garrett physically harmed D.N. in any manner. Instead, Plaintiff presents two instances where D.N. suffered some minor physical injury during her time in Garrett's classroom and asks this Court to infer that those injuries where the result of some misconduct on the part of Garrett. Newbon noticed some dried blood above D.N.'s gums on one occasion. (Newbon Dep. at 37). However, she stated that D.N. had dried lips and would sometimes bleed from her gums, and Newbon did not recall any damage to the inside of D.N.'s lips or mouth. (Id.). On another occasion D.N. suffered a bruise above her eye. (Id. at 66). Her mother did not know how D.N. was injured and assumed that the bruise was from a seizure, which D.N. had from time to time. (Id. at 67). D.N. received no medical treatment for either of the minor physical injuries, and no testimony connects these injuries to any conduct of Garrett's. (Id. at 59). Even should this Court accept without evidence that these injuries were inflicted by Garrett, which it does not, the extent of the injury inflicted is minimal at best and insufficient to "shock the conscience."

Plaintiff argues that D.N. suffered emotional and psychological damage as a result

---

[7]Though the allegation that Garrett would "strike" D.N. in the face with her elbow is troubling to the Court, Garrett's actions do not rise to the "shocks the conscience" level when viewed in light of D.N.'s history of headbutting and other violent behaviors and the apparent minimal force used, the elbowing not having been clearly described as a forceful blow as opposed to a nudge.

-13-

of Garrett's abuse of her and her classmates.[8]  However, while psychological abuse alone may rise to the level of a constitutional deprivation, no court has ever found a psychological injury to meet § 1983's high threshold.  See Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1256 (10th Cir. 1996); Brown ex rel. Brown v. Ramsey, 121 F. Supp. 2d 911, 923 (E.D. Va. 2000); see also M.M. ex rel. J.M. v. Tredyffrin/Easttown Sch. Dist., No. 06-1966, slip op., 2006 WL 2561242, at *13 (E.D. Pa. Sept. 1, 2006); S.M. ex rel. L.G. v. Lakeland Sch. Dist., 148 F. Supp. 2d 542, 547-48 (M.D. Pa. 2001).  Given the—at best, minimal, and at worst, nonexistent—physical injuries inflicted upon D.N., the Court cannot find an injury that literally shocks its conscience and amounts to a deprivation of D.N.'s constitutional rights as required to sustain a claim under § 1983.

### c.  Whether Force Was Applied in Good Faith to Maintain and Restore Discipline

The final factor to be considered in determining whether a constitutional violation has occurred is whether the force was applied in good faith or was "inspired by malice or sadism . . . amount[ing] to a brutal and inhumane abuse of official power."  See id. (quoting Hall, 621 F.2d at 613).  Rodriguez and Mort have stated that Garrett would assign D.N. tasks which she could not complete and thereby provoke some form of misconduct requiring a need to discipline. (Rodriguez Dep. May 28, 2008, at 74-75; Mort Dep. May 28, 2008, at 52-53).

---

[8]Though Plaintiff alleges that D.N. witnessed numerous acts of abuse by Garrett, the Court notes that Plaintiff does not present evidence regarding whether D.N. was actually present in the classroom during the time the incidents occurred.  The Court is asked to presume that D.N. witnessed Garrett's more extreme conduct because D.N. was a student in Garrett's class and because Garrett was subsequently removed and arrested for child abuse.  The Court finds this oversight problematic given the rotating nature of classes at South Seminole, where the students spent a half-day with each teacher.

While arguably a jury could find that Garrett's conduct towards D.N. was malicious, an equally strong argument exists that Garrett acted in a good faith attempt to restore discipline to protect herself or others from D.N.  The Court finds that this factor does not weigh in the favor of either party.  Given that two of the three factors examined weigh in favor of Garrett and that the Court assigns no weight to the third factor favorable to either side, the Court cannot find that Garrett's conduct amounted to a brutal and inhumane abuse of official power sufficient to shock the conscience, even considering D.N.'s vulnerable status.

"[T]he Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." Neal, 229 F.3d at 1074.  As the Court finds that D.N.'s constitutional rights have not been violated, it is unnecessary to determine whether the law was clearly established at the time of the alleged injury in order to determine the merits of Garrett's qualified immunity defense. Accordingly, Garrett's Motion for Summary Judgment (Doc. 66) is hereby granted.

### IV. Seminole County School Board's Motion

#### A. Section 1983

"A plaintiff seeking to impose liability on a municipality (school district) under section 1983 must identify a municipal 'policy' or 'custom' that caused a deprivation of federal rights." Davis ex rel. Doe v. Dekalb County Sch. Dist., 233 F.3d 1367, 1375 (11th Cir. 2000). Liability will not attach under a theory of *respondeat superior*; rather, a school board policy or custom must actually cause the deprivation of the plaintiff's constitutional rights if a school board is to be held liable for a plaintiff's constitutional injury. Doe v. Faerber, 446 F. Supp. 2d 1311, 1316 (M.D. Fla. 2006).

"[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A prerequisite to municipal liability is that the plaintiff must have suffered a constitutional violation at the hands of a government actor. See Davis, 233 F.3d at 1375. If that prerequisite fails, liability on the part of the municipality must fail as well. S.M., 148 F. Supp. 2d at 551 ("Unless the plaintiff can establish that she suffered a violation of a constitutional right, 'it is irrelevant for purposes of section 1983 liability whether [the municipality's] policies, enacted with deliberate indifference, caused an injury.'" (quoting Regalbuto v. City of Phila., 937 F. Supp. 374, 378 (E.D. Pa. 1995))); Thomas, 467 F. Supp. 2d at 492 ("[P]laintiffs' failure to proffer competent evidence to support a finding that [the defendant] deprived [the child] of a constitutional right forecloses their ability to establish municipal liability against these defendants for the same conduct."); Boldthen v. Indep. Sch. Dist., 865 F. Supp. 1330, 1338 (D. Minn. 1994) ("[T]he lack of a constitutional violation by school officials proves fatal to Plaintiffs' claim against the school district."). Because the Court has concluded that D.N. has failed to establish a constitutional violation, any attempt to impose § 1983 liability on the School Board fail. As to Count I, Defendant the School Board's Motion for Summary Judgment must be granted.

### B. Negligent Hiring, Supervision, and Retention

Having dismissed D.N.'s federal claims, the Court declines to exercise supplemental jurisdiction over the state law claim. See 28 U.S.C. § 1367(c)(3) (district court may decline

to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been dismissed). Accordingly, Count III is hereby dismissed without prejudice.

## V.  Conclusion

In accordance with the foregoing discussion, it is hereby **ORDERED** as followed:

1. Defendant Garrett's Motion for Summary Judgment (Doc. 66) is **GRANTED** as to Count II.

2. Defendant Seminole County School Board's Motion for Summary Judgment (Doc. 61) is **GRANTED IN PART** and **DENIED IN PART**.  Summary Judgment is **GRANTED** as to Count I and **DENIED** without prejudice as to Count III.

3.  Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over the remaining state law claim in Count III.  Accordingly, the claim is **DISMISSED WITHOUT PREJUDICE** to refile it in state court.  As set forth in 28 U.S.C. § 1367(d), the period of limitations for this claim is tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

4. All other pending motions are **DENIED as MOOT**.

5. The clerk is directed to enter a judgment providing that Plaintiff shall take nothing from Defendant Seminole County School Board on Count I; that Plaintiff shall take nothing from Defendant Kathleen Mary Garrett on Count II; and that Count III against Defendant Seminole County School Board is dismissed without prejudice to pursuing that claim in state court.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 21st day of July, 2009.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party